**W.M. SCHLOSSER, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–495C.

United States Court of Federal Claims.

Aug. 8, 2001.

---

148

Michael J. Cohen, Hyattsville, MD, for plaintiff.

David A. Levitt, with whom were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, and Donald E. Kinner, Assistant Director, Civil Division, Department of Justice, Washington, DC, for defendant. J. Page Turney, Department of the Navy, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This is a dispute arising out of a contract between plaintiff W.M. Schlosser, Inc. (Schlosser) and defendant, acting through the United States Department of the Navy (Navy), for the construction of a project know as the Explosive Test Facility, Naval Surface Warfare Center, Indian Head, MD (project). Complaint (Compl.) ¶ 2.[1] Schlosser's two-count complaint seeks equitable adjustments to recover increased field overhead costs resulting from delay and increased costs resulting from differing site conditions. Compl. ¶¶ 9, 14. The Navy's contracting officer issued final decisions denying Schlosser's

---

1. Facts cited to a filing of one party have not been contested.

claims on May 24, 2000, Compl. ¶ 9, and October 27, 1999, Defendant's Proposed Findings of Uncontroverted Facts in Support of Motion for Summary Judgment (DPFUF) ¶ 28,[2] respectively. Schlosser appeals those decisions and requests full payment of its claims. Compl. ¶ 9, 14.

Defendant moves for summary judgment as to both counts. Defendant's Motion for Summary Judgment and Defendant's Brief in Support of Motion for Summary Judgment (Def.Mot.). The matter has been fully briefed. For the reasons set forth below, the court GRANTS defendant's motion.

## I. Background

Schlosser is a Maryland corporation engaged in construction contracting. Compl. ¶ 1. On June 4, 1996, plaintiff entered into Contract No. N62477–94–C–0025 with defendant for construction of a project known as the Explosive Test Facility, Naval Surface Warfare Center, Indian Head, Maryland. *Id.* ¶ 2. The project involved the construction of five bombproof buildings, as well as parking lots and ancillary sheds. Def. Mot. at 1. Notice to proceed was given on June 19, 1996. *Id.* at 2.

### A. Count I: Field Overhead Expenses

The contract provided that the cost of "field overhead" and "overhead on subcontractors" on work resulting from modifications and change orders would be calculated as a percentage of the direct costs of the changed work. Def. Mot. Appendix (App.) at 4. The contract also specifically provided that "[f]ield overhead will be evaluated as a percent mark-up and NOT a direct cost to the change proposal." *Id.* Plaintiff's bid for these costs was 8 percent of the direct cost of the additional work. *Id.*

Over the course of performance of the contract, ninety-five changes were either agreed to by the parties or imposed by defendant. DPFUF ¶ 6. These modifications and change orders increased the contract

price of $10,696,000.00 by $622,555.50 to $11,318,555.50. DPFUF ¶ 3, 6. Eight of the changes—Nos. A00030 (30), A00033 (33), A00034 (34), A00039 (39), A00044 (44), A00055 (55), A00056 (56), and A00066 (66)— extended the contract completion date by 224 days. DPFUF ¶ 6.

With respect to modifications 34, 39, and 44, which together accounted for 46 days of contract period extension, plaintiff was paid $713.73 per day to cover direct costs of field overhead, a type of compensation not contemplated by the contract.[3] Compl. ¶ 7; DPFUF ¶ 7; Def. Mot. at 6. Plaintiff later requested per diem compensation of $713.73 for field overhead for the remaining 162 days by which the contract was extended. Compl. ¶ 8. The contracting officer issued a final decision denying the claim for per diem compensation on May 24, 2000. *Id.* ¶ 9; Def. Mot.App. at 30–33; Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment (Def.Rep.) Attachment (Att.) 2.

### B. Count II: Differing Site Conditions

In Count II of its complaint, plaintiff contends that it encountered a differing site condition in the form of unsuitable soil. Compl. ¶ 12. Because it encountered soil "consisting of organic materials and clay" which was "unsuitable for the required construction," plaintiff "was forced to excavate the unsuitable soil, remove it from the construction site, and import select suitable fill ... incurr[ing] additional costs of $43,809.05." *Id.* ¶¶ 12–13. Defendant replies that the contract itself including the geotechnical report (geotechnical report) provided in the bid package reveals that soils on site did not meet contract specifications and that plaintiff was or should have been aware that it would need to import suitable fill. Def. Mot. at 12–14. By letter dated July 27, 1999, plaintiff requested the contracting officer's final decision on its claim. Compl. ¶ 14. The contracting officer issued a final decision

---

2. Defendant's proposed findings include two consecutive paragraphs numbered 28. All citations to paragraph 28 refer to the second paragraph bearing this number, found at page 8 of the findings.

3. While the briefing does not indicate whether plaintiff was also paid the 8 percent markup contemplated by its contract on these modifications, that payment or lack of it is not in dispute.

denying the claim in a letter dated October 27, 1999.[4] DPFUF ¶ 28; Def. Mot.App. at 135.

## II. Discussion

### A. Summary Judgment and Standard of Review

In deciding defendant's motion for summary judgment, the court construes all facts in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court will grant the motion when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule of the Court of Federal Claims (RCFC) 56; *see also Anderson,* 477 U.S. at 247, 106 S.Ct. 2505.

### B. Count I: Delay

#### 1. Contract Provision for Overhead Expenses and Plaintiff's Claim of Change

■ The starting point in interpreting a contract is the plain language of the contract. *Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998). Schlosser's contract with the Navy specified how increased overhead resulting from changes to the contract should be calculated. The contract provides that "[f]ield overhead will be evaluated as a percent mark-up and NOT a direct cost to the change proposal." Def. Mot.App. at 4.

Plaintiff bid 8% for purposes of this provision and was paid a markup of 8% on work performed under modifications and change orders. DPFUF ¶¶ 4,7; Def. Mot.App. at 4. However, with respect to modifications 34, 39, and 44, defendant reports that it "inadvertently failed to apply the percentage method," Def. Mot. at 3, and paid for delay overhead on a per diem basis instead, DPFUF ¶ 10. Defendant describes these payments as a "mistake." Def. Mot. at 3. Plaintiff contends that, notwithstanding the

language of the contract, "the Navy agreed to pay Schlosser's extended field overhead costs" at a per diem rate for all periods of delay. Plaintiff's Opposition to Motion for Summary Judgment (Pl.Opp.) at 2.

■ In resolving this dispute, the court looks to Federal Circuit precedent, which teaches that the "primary function of the court [in a contract dispute] is the ascertainment of the intention of the parties." *Alvin, Ltd. v. United States Postal Serv.,* 816 F.2d 1562, 1565 (Fed.Cir.1987) (quoting 4 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 601 (3d ed.1961)). In *Alvin,* the United States Postal Service (Postal Service), prior to 1978, entered into leases for real property. *Id.* at 1563. Under these leases, the Postal Service agreed to pay "general real estate tax bills" for leased properties, but not "special assessments." *Id.* In 1978, Proposition 13 added Article XIIIA to the California Constitution. *Id.* As a result, general real estate tax bills decreased significantly and services previously funded through general property taxes began to be billed separately as special assessments. *Id.* at 1563–64. From 1978–81, the Postal Service paid some of these special assessments; after 1981, it contended that these payments were a "mistake," and refused to pay any further special assessments, maintaining that its lease only required payment of general real estate tax bills, not special assessments. *Id.* at 1564. The Federal Circuit, after examining the intent of the parties, sought to "reinstate the original bargain," and concluded that the Postal Service's original commitment to pay general real estate taxes required payment "of those levies that succeeded the general real estate taxes [i.e. the post–1978 special assessments], however those successor taxes are denominated." *Id.* at 1566.

The present case appears to be close to the reverse of *Alvin.* Here, the original bargain is clear. Plaintiff was to be paid a mark-up of 8% on all modifications and change orders

---

4. While plaintiff states in the complaint, filed August 21, 2000, that "the contracting officer has yet to issue a final decision on Schlosser's claim," Compl. ¶ 14, plaintiff does not contest references in defendant's briefing to the final decision issued by letter on October 27, 1999,

DPFUF ¶ 28; Def. Mot.App. at 135, so there appears to be no dispute on this point. In any event, the failure of a contracting officer to have responded timely to plaintiff's claim would not affect this court's jurisdiction. 41 U.S.C. § 605 (1997).

to compensate it for overhead costs. It appears that defendant compensated plaintiff on a per diem basis for extension of time related to certain modifications; however, these payments were a departure from the original bargain. Instead of asking the court to enforce the original terms of the contract, plaintiff here asks the court to find a new contract.

■ In order to sustain plaintiff's claim, the court must find an implied-in-fact contract between plaintiff and defendant regarding compensation on overhead resulting from modifications and change orders. Plaintiffs who allege an implied-in-fact contract with the government must show "a mutual intent to contract including an offer, an acceptance, and consideration." *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir. 2001) (citing *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997) and *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990)). Further, a plaintiff must show that the government representative who entered into the contract was "authorized to bind the United States into the agreement in question." *Id.*

■ Plaintiff presents two pieces of evidence which it claims are sufficient to create a dispute regarding an issue of material fact as to the parties' intent to create a contract to pay on a per diem basis with respect to all extensions. First, plaintiff presents a letter written by its project manager to the Navy's resident officer in charge of construction. Pl. Opp. Att. 2. The letter memorializes a meeting held on October 23, 1997, noting that there was "negotiation and agreement on a daily rate for all awarded compensable time." *Id.* However, the letter fails to indicate that any offer was ever made to or accepted by defendant. The letter was written by plaintiff's project manager and therefore does not contain any representation subscribed to by defendant. The letter is also silent as to which time was "awarded;" the letter offers no evidence to suggest that the negotiated daily rate "awarded" by defendant would extend beyond the 45 days which the government in fact paid to apply as well to the 162 days Schlosser now seeks. Finally, the letter reports that the negotiated rate for "award-ed" days would be "$609.00 per calendar day," not the $713.73 Schlosser now seeks. *Compare* Pl. Opp. Att. 2 *with* Compl. ¶ 7. The letter is insufficient to establish that defendant intended to change the terms of the contract.

■ The second piece of evidence plaintiff produces is change order 66, which states, "This modification does not address extended overhead and will be addressed at a later date." Pl. Opp. at 3. Like the letter, this document also fails to establish mutual intent to contract on agreed terms. The sentence on which plaintiff relies merely acknowledges that extended overhead "will be addressed at a later date;" the document is silent as to how the parties intended to address the issue.

■ Finding a contract in these circumstances would also be inconsistent with Federal Circuit precedent that "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Trauma Serv. Group v. United States,* 104 F.3d at 1326 (citing *Atlas Corp. v. United States,* 895 F.2d 745, 754–55 (Fed.Cir.1990)). Here, the contract's changes clause explicitly provides for compensation for overhead on modifications and change orders. DPFUF ¶ 4; *see also* Def. Mot.App. at 4. This explicit provision precludes any implied agreement on the subject.

2. Suspension of Work Clause

In a further attempt to avoid the "equitable adjustment" of 8% which the changes clause of the contract provides for overhead on work performed under change orders, plaintiff draws a distinction between delay arising "from the actual performance of the work" and "administrative delay in issuing the change order documents." Transcript of July 25, 2001 Status Conference (Tr.) at 13–14. Plaintiff notes that the latter kind of delay is not compensated by the markup because "delay in issuing the change order in and of itself is not any additional work that can be marked up." *Id.* at 15. For compensation for this kind of delay, plaintiff looks to the Suspension of Work clause. Pl. Opp. at 4; Tr. at 17.

Plaintiff finds support for its position in the instructions which accompanied the 1967 revisions to the Changes clause, which provided:

> Except for defective specifications, the Changes clause as revised will continue to have no application to any delay prior to the issuance of a change order. An adjustment for such type delay, if appropriate, will be for consideration under the provisions of the Suspension of Work clause.[5]

32 Fed.Reg. 16,269 (1967). In support of its contention that delay should not be considered under the Changes clause, plaintiff presents the affidavit of its vice president stating that "[i]n most instances, the time extensions were issued for delays in administering and issuing the change and not for delays directly associated with the changed or extra work." Pl. Opp. Att. 1.

While defendant suggests that the time extensions did in fact result from work performed under change orders, Def. Mot. at 7–8, neither party has produced evidence more substantial than undocumented assertions. The court resolves this apparent ambiguity in favor of plaintiff for purposes of summary judgment and accordingly examines plaintiff's claim under the Suspension of Work Clause.

 In this case, there was no formal suspension of work. Tr. at 16. Thus, in order to recover under the Suspension of Work, plaintiff must show that:

> (1) contract performance was delayed; (2) the government directly caused the delay; (3) the delay was for an unreasonable period of time; and (4) the delay injured the contractor in the form of additional expense or loss.

*Melka Marine, Inc. v. United States*, 38 Fed. Cl. 545, 546 (1997). Not only has plaintiff failed to put forward evidence to show that these elements are met, plaintiff has conceded that it is unlikely that it could do so. Plaintiff admits that "there is nothing in the record" that shows a suspension of work, but plaintiff contends that "there were periods of time when virtually nothing was happening on the project." Tr. at 17. However, plaintiff admits that "[i]t never got to the point where the project was demobilized." *Id.* Periodic starting and stopping during a large construction project is to be expected and does not constitute the "unreasonable period of time" which characterizes a suspension of work, *Melka Marine*, 38 Fed.Cl. at 546, nor has plaintiff established that this delay was "directly caused" by the government.

## C. Differing Site Conditions

Count II of Schlosser's claim focuses on whether it encountered differing site conditions, entitling it to additional time and compensation. Compl. ¶¶ 10–14; *see* FAR § 52.236. Schlosser alleges that it encountered soil that was materially different from that specified in the Solicitation; for this reason, Schlosser had to import suitable fill at a cost of $43,809.05. Compl. ¶ 12–13.

The "Differing Site Conditions" clause found at FAR § 52.236 provides for two types of differing site conditions. Although not entirely clear from the complaint, it appears that plaintiff attempts to state a claim for a Type I differing site condition. Type I differing site conditions occur when "subsurface or latent physical conditions at the site . . . differ materially from those indicated in this contract."[6] FAR § 52.236–2(a)(1).

---

5. As cases cited by plaintiff make clear, the source of the delay is crucial to determining how the delay is to be compensated. *Compare Model Eng'g and Mfg. Corp.*, A.S.B.C.A. 7490, 1962 B.C.A. ¶ 3363, 1962 WL 591 ("delays antecedent to a change order and not resulting from it are not justiciable under the Changes article"), *with Weldfab, Inc.*, I.B.C.A. 268, 61–2 B.C.A. ¶ 3121 (concurring with *Model Eng'g and Mfg.*, but observing that "the Board does not mean to imply that in a proper case, other types of expense incurred prior to the issuance of a change order, and properly attributable to it, cannot be allowed.").

6. Type II differing site conditions occur when "unknown physical conditions at the site, of an unusual nature, . . . differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." FAR § 52.236(a)(2). Plaintiff has alleged nothing unusual or not ordinarily encountered. Its complaint simply alleges that the unsuitability of the soil was not revealed in the contract documents, an example of the kind of "subsurface or latent physical conditions" contemplated by a Type I claim. FAR § 52.236(a)(1).

To establish a Type I differing site conditions claim, plaintiff must "prove by a preponderance of the evidence, that the conditions indicated in the contract differ materially from those it encounters during performance." *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1274 (Fed.Cir.2001) (quoting *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir.1998)) (internal quotations omitted). This standard has been interpreting as requiring that plaintiff show each of the following six elements: (1) that the contract affirmatively indicated subsurface conditions, (2) that the plaintiff acted as a reasonably prudent contractor in interpreting the contract documents, (3) that the contractor reasonably relied on the contract's indications of subsurface conditions, (4) that the subsurface conditions actually encountered differed materially from subsurface conditions indicated in the contract, (5) that the subsurface conditions encountered were reasonably unforeseeable, and (6) that the contractor's claimed excess costs were solely attributable to the materially different subsurface conditions within the contract site. *Weeks Dredging & Contracting Inc. v. United States*, 13 Cl.Ct. 193, 218 (1987). To determine whether plaintiff has met this burden, the court should place itself "into the shoes of a 'reasonable and prudent' contractor to decide how such a contractor would act [in interpreting the contract documents]." *Id.* (citations omitted).

Here, the first element is clearly established; the contract affirmatively indicates subsurface conditions. The dispute in this case is about the interpretation of these indications. The court therefore considers the indications of subsurface conditions together with the parties' interpretations.

The contract specifications for "filling and backfilling" required use of "controlled fill and controlled backfill under spread footing, concrete slabs not pile supported, and pave-

ments." Def. Mot.App. at 46; DPFUF ¶ 13. Controlled fill and backfill, which were defined as "[a] specified soil mix on gradation of materials constructed to attain maximum bearing strength and minimize consolidation or differential settlement under a load," Def. Mot.App. at 37, were to consist of "materials classified as GW [well graded gravel], GP [poorly graded gravel], SW [well graded sand], [and] SP [poorly graded sand]."[7] *Id.* at 41. The contract specifications also mandated compaction, liquid limit, and plasticity requirements for soil used to support underground utility lines. Def. Mot. at 13–14; Def. Mot.App. at 97, 98, 102.

In the section of the contract entitled "Earthwork for Structures and Pavements," the contract instructed potential bidders to "base bids on the following criteria":

e. Borrow material suitable backfill and fill material in the quantities required is not available on Government property.

Def. Mot.App. at 34, 39. A similar instruction is found in the contract section entitled "Excavation, Backfilling, and Compacting for Utilities." Def. Mot.App. at 94, 101. The court finds as a matter of law that this language was sufficient to put a reasonable contractor on notice that suitable fill might be unavailable on site, resulting in a need to import fill.

The bidding criteria for "Earthwork, Structures and Pavements" also instruct that "the character of the material to be excavated or used for subgrade is as indicated." Def. Mot.App. at 39. Similar language is found in the bid criteria for "Excavation, Backfilling, and Compacting for Utilities." *Id.* at 101. "As indicated" refers to indications of soil and water conditions throughout the contract documents. *Randa/Madison*, 239 F.3d at 1270–72.

The geotechnical report, which was included in the bid package, contained indications of soil conditions.[8] Def. Mot.App. at 53–86; DPFUF ¶ 15. Plaintiff alleges that the geo-

---

7. Definitions of the abbreviations are taken from the filings. Def. Mot.App. at 74 (table in appendix to geotechnical report defining soil abbreviation symbols). The contract specifications further instructed bidders that they might use materials classified "by ASTM D 2487." Def. Mot.App. at 41. Defendant informs the court that this instruction does not add to the

specifically enumerated types of acceptable soil. Tr. at 9. Plaintiff does not dispute this point. *Id.*

8. It is well settled that "documents and materials mentioned in the bidding documents" form part of the contract. *McCormick Constr. Co. v. United*

technical report indicated that on-site soil would be suitable for construction. Compl. ¶ 12. This allegation is not supported by the terms of the geotechnical report. The geotechnical report summarized the results of ten soil borings by noting that Stratum A consisted of "brown and black sand, gravel, clay, and silt FILL, with wood," Stratum B consisted of "brown and gray sandy LEAN CLAY (CL), FAT CLAY (CH), and SILT (ML), with clayey sand and gravel," and Stratum C consisted of "brown, gray, and green clayey SAND (SC) and poorly graded sand (SP), with gravel." Def. Mot.App. at 60. Only poorly graded sand, which makes up part of Stratum C, meets the specifications of the contract. Based on the clear terms of the project specifications including the geotechnical report, the court concludes that a reasonable contractor interpreting the specifications would have been advised that the soil at the construction site might not meet project specifications and that the contractor had the responsibility of procuring any additional fill.[9]

Plaintiff urges an alternative interpretation offered by its consultant's analysis of the boring logs provided in the geotechnical report. Pl. Opp. at 5; see Def. Mot.App. at 130–133. Plaintiff's consultant purports to demonstrate that "a minimum depth of suitable on-site backfill for the utility lines of 750mm should have been available based on the boring logs." Pl. Opp. at 5.

Based on the geotechnical report and its consultant's analysis of it, plaintiff argues that "[w]hat Schlosser should have anticipated based on the contract and available geotechnical information presents a complex question of law and fact inappropriate for summary judgment." Pl. Opp. at 5. The court disagrees. Whether the contract documents indicated subsurface conditions and whether plaintiff's interpretation of the contract documents is reasonable are questions of contract interpretation. Contract interpretation is a matter of law and appropriate for disposition on summary judgment. *Textron Def. Sys.*, 143 F.3d at 1468.

An interpretation is unreasonable if it is based on some contract indications to the exclusion of others. *See B.D. Click Co. v. United States*, 222 Ct.Cl. 290, 614 F.2d 748, 753 (1980). The consultant's analysis is an unreasonable interpretation in light of the bidding criteria. It is in direct conflict with contract indications that the types of soil called for in the contract specifications for utilities were not present at the site. The consultant's conclusions represent at best a post hoc resolution of a patent ambiguity in the contract materials between indications in the geotechnical report that suitable fill soil could be available onsite contrasted with on-site bidding criteria indications that suitable fill was not available.[10] Such an ambiguity would give rise to a duty to inquire; plaintiff's failure to inquire precludes plaintiff now from proffering its interpretation after the fact. *T. Brown Constructors, Inc.*, 132 F.3d at 731.

## III. Conclusion

For the foregoing reasons, the court GRANTS defendant's Motion for Summary Judgment. The Clerk of the Court shall enter judgment for defendant. Each party shall bear its own costs.

IT IS SO ORDERED.

States, 18 Cl.Ct. 259, 263 (1989), *aff'd*, 907 F.2d 159 (Fed.Cir.1990).

9. Notwithstanding the requirements of the contract specifications and its own report of soil analysis, the geotechnical report goes on to state that "[t]he natural soils of Strata B and C are considered suitable for support of shallow foundations; however, the fill soils of Stratum A are not considered suitable." Def. Mot.App. at 62. Whether suitable for foundations or not, the soils in Strata B and C do not meet the requirements of the contract specifications. Thus, this language interpreted in the light most favorable to the plaintiff at best creates a patent ambiguity in the bid package about which plaintiff had a duty to inquire. *See T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 731 (Fed.Cir.1997).

10. The court notes that the consultant's report, dated June 17, 1998, concludes that "the contractor is entitled to appropriate compensation due to differing site condition," Def. Mot.App. at 130, 133, indicating that the interpretation of the geotechnical data provided in the consultant's report postdates the dispute.