**KATO CORPORATION, Appellant,**

v.

**James G. ROCHE, Secretary of the Air Force, Appellee.**

No. 02–1315.

United States Court of Appeals, Federal Circuit.

Feb. 21, 2003.

Before MAYER, Chief Judge, MICHEL, and DYK, Circuit Judges.

DYK, Circuit Judge.

Kato Corporation ("Kato") appeals the decision of the Armed Services Board of Contract Appeals ("the Board") denying Kato's claim for additional compensation under a contract between Kato and the Air Force. Kato alleges that it is entitled to an equitable adjustment of the contract price to compensate it for expenses it incurred in excavating, stockpiling and replacing contaminated soil encountered while removing an underground storage tank. The Board held that Kato was not entitled to an equitable adjustment based on differing site conditions. *In re Kato Corp.*, ASBCA No. 51513, 02–1 BCA ¶ 31,-669 at 156,492, 2001 WL 1562270 (Nov. 30, 2001). We *affirm.*

## BACKGROUND

The Air Force awarded Contract No. F45603–96–C–0004 ("Contract") to Kato in November 1995, at a fixed price of $502,801.00. The contract required Kato to make improvements to the heating and ventilation system at McChord Air Force Base, Building 1305, and to excavate and remove an adjacent 2,000–gallon underground fuel oil storage tank. *Id.* at 1.

The contract provided an overview of the work required to remove the storage tank:

The work consists of removal, decontamination and disposal of one, 2000–gallon underground storage tank and associated piping and ancillary equipment. The tank is constructed of steel and is at the approximate location shown on the drawings. The 2000–gallon tank was used for storing fuel oil and has not been taken out of service. Residue remaining in the tank is considered a hazardous waste. Subsurface conditions are not known. The Contractor is re-

sponsible for verifying the actual conditions prior to submitting a bid.

*Id.* at 156,493.

Various clauses in the contract related to the prospect of finding contaminated soil at the worksite. The contract contained a provision providing, "[it] is not anticipated that contaminated soil will be encountered. If found, contact the Contracting Officer or authorized representative for further direction." *Id.* A variety of other provisions addressed the contractor's responsibilities in the event contaminated soil was discovered. For example, the paragraph entitled "Tank Excavation" provided, in part:

Excavation around the perimeter of the tank shall be performed in a manner that will limit the amount of potentially contaminated soil that could be mixed with previously uncontaminated soil. Contaminated soil shall be segregated in separate stockpiles. Surface water shall be diverted to prevent direct entry into the excavation.

(J.A. at 23.) The contract paragraph entitled "Stockpiles" provided, in part:

Excavated material which is visibly stained and which has an obvious petroleum odor or as required by the State of Washington or implementing agency shall be considered contaminated and shall be stockpiled for sampling in accordance with Paragraph Stockpiled Material Sampling. Uncontaminated soil shall be stockpiled separately from the contaminated soil, a safe distance away from, but adjacent to, the excavation. Contaminated soil shall be placed on an impermeable geomembrane a minimum of 30 mils thick, and covered with a 10 mil sheet of geomembrane. The geomembrane shall be placed such that the stockpiled soil does not come into contact with surface water run-off. The 10 mil geomembrane cover shall prevent

rain or surface water from coming into contact with the contaminated soil, as well as limit the escape of the volatile constituents in the stockpile.

*Kato,* 02–1 BCA at 156,493. In addition, the contract included a full paragraph devoted entirely to the subject of contaminated soil, entitled "Contaminated Soil":

After the tank has been removed from the ground, the adjacent and underlying soil shall be examined for any evidence of leakage. The soil shall be visually inspected for staining and also screened for the presence of volatile and semi-volatile hydrocarbon contamination using a real time vapor monitoring instrument. Contaminated soil shall be stockpiled onsite per Paragraph Stockpiles. The State of Washington inspector shall determine the extent of the contaminated soil to be removed from each site but shall not exceed 20 cubic yards per site. Any evidence that contamination exceeds that indicated in the contract shall be reported to the Contracting Officer or authorized representative on the same day it is discovered. After the known contaminated soil is removed, the excavation shall be sampled and analyzed per Paragraph SOIL EXAMINATION, TESTING, AND ANALYSIS.

*Id.* There were various other provisions in the contract, too numerous and lengthy to quote in their entirety, addressing measures to be taken in the event contaminated soil was encountered.

The contract clause relating to payment for removal of the storage tank provided that payment, "shall be under the base bid for the tank removal and shall constitute full payment for all work defined in the contract documents including testing of the contents, excavation and disposal of the tank, and testing of the underlying soil." *Id.*

Kato began excavation of the storage tank on March 11, 1996. After the excavation was complete, Kato discovered that soil underlying the tank was contaminated with petroleum residue. On March 14, 1996, Kato informed the Air Force that it had discovered contaminated soil and provided test results regarding the level of contamination in the soil. A dispute arose as to whether Kato was required to excavate and stockpile the contaminated soil within the original contract price. On July 31, 1996, the Air Force directed Kato to excavate and stockpile 20 cubic yards of contaminated soil and to replace it with clean fill dirt. Kato performed this work. *Id.* at 156,494.

On January 7, 1998, Kato submitted to the Air Force a claim for $7,594.07 in compensation for "stockpiling contaminated soil and related activities." (J.A. at 47.) Kato claimed this compensation under the contract's differing site conditions clause.

The contract incorporated by reference section 52.236–2 of the Federal Acquisition Regulations, entitled "Differing Site Conditions." That section provides, in part:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract

\* \* \* \* \* \*

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable ad-

justment shall be made under this clause and the contract modified in writing accordingly.

48 C.F.R. § 52–236–2 (2002).

Kato claimed that "[t]he Contract documents clearly indicated that no contaminated soil was anticipated to be encountered ... the fact that the Contract documents provided a method for *handling* unexpected contaminated soil does not explicitly or implicitly resolve the question of who is to *pay* for handling the contaminated soil." (J.A. at 52–53.)

On March 17, 1998, the contracting officer issued a final decision granting Kato $1,241.85 of the claim.[1] This represented compensation for "extended fence rental, extended supervision costs, and proposal costs." *Kato* 02–1 BCA at 156,494. However, the contracting officer concluded that Kato was obligated to excavate and stockpile up to 20 cubic yards of contaminated soil as part of the work paid for under the base bid. Therefore, the contracting officer decided, Kato was not entitled to additional compensation for this work. *Id.*

On May 6, 1998, Kato appealed the contracting officer's denial of the remainder of its claim to the Board.

The Board denied Kato's appeal. The Board stated that in order to determine if Kato was entitled to compensation for differing site conditions, "we must first determine whether appellant's contract as awarded contained a positive indication that the subsurface soil surrounding the tank was free of contamination." *Id.* at 156,495. The Board found that the only statement in the contract Kato could adduce to support its position that there was a positive indication was the phrase in paragraph 3.5.1, "[i]t is not anticipated that contaminated soil will be encoun-

---

1. The Air Force does not dispute Kato's entitlement to this amount.

tered." *Id.* The Board found that, in context, this statement could not be characterized as a positive indication that no contaminated soil would be encountered. In fact, the Board noted, "the next sentence goes on to provide that appellant should consult with the Government in the event contamination was discovered." *Id.* The court noted that there were numerous other indications in the contract that contaminated soil might be encountered and that paragraph 1.6 "expressly stated that '[s]ubsurface conditions are not known.'" *Id.* Therefore, the Board rejected Kato's claim for equitable adjustment based on differing site conditions.[2]

Kato timely filed this appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) and 41 U.S.C. § 607(g)(1)(A).

## DISCUSSION

Differing site conditions consist of "subsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract." 48 C.F.R. § 52.236–2 (2002). In order to establish entitlement to an equitable adjustment due to differing site conditions, a contractor must prove the following elements by preponderant evidence:

> the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions.

*Comtrol, Inc. v. United States,* 294 F.3d 1357, 1362 (Fed.Cir.2002) (citing, *H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed.Cir.1998).

As the first element of this test indicates, a contractor is not entitled to a differing site condition equitable adjustment unless the contract affirmatively indicates what the condition of the subsurface soil will be. Kato argues that the contract contains an affirmative indication that the subsurface soil will not contain fuel contamination: "[it] is not anticipated that contaminated soil will be encountered." *Kato,* 02–1 BCA at 156,495. This is not a positive indication of subsoil conditions, sufficient to support a claim for differing site conditions. In *Comtrol,* we held that the contract phrase, "[h]ard material ... may be encountered" was not a "specific representation as to the type of soil to be encountered," such as to support a differing site conditions claim resulting from the presence of quicksand at the worksite. 294 F.3d at 1362, 1363. We must draw the same conclusion in this case. The phrase at issue here is not a representation of the Air Force's knowledge as to soil conditions, but merely a statement of what the Air Force anticipated. This should have been clear to Kato, because the contract paragraph entitled "Project/Site Conditions" states, "Subsurface conditions are not known." *Kato,* 02–1 BCA at 156,493. Furthermore, the phrase, "[it] is not anticipated that contaminated soil will be encountered," is immediately followed by instructions on what the contractor is to do should soil contamination be discovered: "If found, contact the Contracting Officer or authorized representative for further direction." *Id.* Moreover, there are numerous other contract provisions that contemplate the possible

---

**2.** The Board also rejected Kato's claim for equitable adjustment based on the theory of constructive change. Kato does not challenge this determination on appeal.

existence of contaminated soil. Therefore, Kato could not reasonably interpret the paragraph as a representation of the Air Force's knowledge as to subsurface soil conditions.[3] Because there is no indication in the contract that the subsurface soil would be free from contamination, Kato cannot prevail on its differing site conditions claim.

## CONCLUSION

For the foregoing reasons, the decision of the Board of Contract Appeals is affirmed.

---

**3.** There is no suggestion here that the government knowingly misrepresented the state of its knowledge concerning the soil conditions. See *Rumsfeld v. Applied Cos.,*318 F.3d 1317 (Fed.Cir.2002) (holding that the government's failure to notify the contractor that it had underestimated its requirements in the solicitation represented a breach of contract); *Restatement (Second) of Contracts* § 168 (1981).