ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Meltech Corporation, Inc. | ) | ASBCA Nos. 61762, 61764 |
| | ) | |
| Under Contract No. W912DR-14-D-0021 | ) | |

APPEARANCES FOR THE APPELLANT:     Leonard A. Sacks, Esq.
                                                              Leonard A. Sacks & Associates, P.C.
                                                              Rockville, MD
                                                          Fred A. Mendicino, Esq.
                                                              Faughnan Mendicino PLLC
                                                              Dulles, VA

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                                              Engineer Chief Trial Attorney
                                                          Adam J. Kwiatkowski, Esq.
                                                              Engineer Trial Attorney
                                                              U.S. Army Engineer District, Baltimore

OPINION BY ADMINISTRATIVE JUDGE CATES-HARMAN

This appeal arises from a contract between Meltech Corporation, Inc. ("Meltech" or "appellant"), and the U.S. Army Corps of Engineers ("USACE" or "government") for a Multiple Award Task Order contract that included both Design-Build and Design-Bid-Build construction projects within the Baltimore District Area of Responsibility, and the September 30, 2014, award by USACE of a Firm-Fixed-Price Task Order No. 0002 to Meltech for all costs in connection with the renovation, design, and construction of Building 8609, located at Ft. Meade, MD. The appeals captioned above are related to thirteen (13) other appeals that were consolidated and heard by the Board.[1] These appeals involve claims related to the hammerhead roof.

---

[1] ASBCA Nos. 61694, 61762, 61763, 61764, 61765, 61766, 61767, 61869, 61870, 61871, 61872, 62091, 62987. The lead appeal is ASBCA No. 61694. On December 17, 2021, a decision on summary judgment was issued in ASBCA Nos. 61706 and 61768. On July 16, 2025, a decision was issued in ASBCA Nos. 61766, 61767 and 61872. On January 6, 2026, a decision was issued in ASBCA No. 61765. Familiarity with those decisions is presumed.

1

The Board has jurisdiction over these appeals under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109. A nine-day hearing was held via videoconference. For the reasons stated below, we sustain the appeal.

FINDINGS OF FACT

*Contract and Task Order*

1. On June 10, 2014, USACE issued a Request for Proposals (RFP) for a Multiple Award Task Order Contract (MATOC) that included design-build and design-bid-build construction projects within the Baltimore District area of Responsibility. This was Phase 1 of a two-phase construction procurement. (Joint Stipulations of Fact, General Background (JSOF GB) ¶ 1; R4, tab 2))

2. The MATOC included renovating several similar dormitory buildings at Fort Meade, including Building 8609 (JSOF GB ¶ 3).

3. On August 14, 2014, USACE issued Amendment 0003 to RFP W912DR-14-R-0003 for two seed projects under the MATOC to provide Design Criteria for the Design-Build renovation of Building 8609 at Fort Meade and Building 4501 at Aberdeen Proving Ground. Each task order was to be awarded separately. (JSOF GB ¶ 7)

4. On September 15, 2014, Meltech submitted its technical and cost proposals for the Building 8609 renovation. Meltech's proposal included a preliminary schedule. According to this schedule, the design period would begin on November 18, 2014, and end on June 4, 2015. The construction period would begin on May 29, 2015, and end on April 26, 2016. (JSOF GB ¶¶ 11-12)

5. On September 29, 2014, USACE awarded Meltech Base Contract No. W912DR-14-D-0021. On September 30, 2014, USACE awarded Task Order Contract No. 0002 to Meltech for the renovation of Building 8609 at Fort Meade. The Task Order Contract provided Meltech with a 540-calendar day performance period beginning from the Notice to Proceed date. The Notice to Proceed was issued on November 17, 2014, and the original completion date was May 10, 2016. (JSOF GB ¶¶ 13-16)

*The Existing Roof Structure*

6. Prior to the renovation, the hammerhead portion of Building 8609, which housed the main entry and administrative community functions of the building, had an EPDM (Ethylene Propylene Diene Monomer) roof (Joint Stipulations of Fact, ASBCA Nos. 61762, 61764, hereinafter (JSOF) ¶ 6); R4, tab 3 at 7). The roof was flat.

2

7.  In contrast, a gable roof is a roof consisting of two sections whose upper horizontal edges meet to form its ridge (JSOF ¶ 7).

*Black And Veatch Expected The New Roof To Be Installed On The Existing Roof*

8.  USACE contracted with Black and Veatch (B-V, Designer of Record) to prepare "a partial criteria Design-Build Request for Proposal" package for the renovation of Building 8609, including a "[n]ew, sloped roof" (app. supp. R4, tab 351 at 5).  The scope of B-V's work was to "[d]evelop performance criteria for all design disciplines for the Request for Proposal [] Design-Build Package.  Use tables, text, sketches, drawings and others to illustrate the performance criteria" (*id.* at 6).  The architect-engineer services by B-V were to "provide all necessary services required for the preparation of a complete and biddable RFP Design-Build Package" (*id.* at 7).

9.  B-V was provided a copy of a drawing FE 8257 dated April 7, 1995, titled "Roof Details BLDG 8609."  This figure provides details of component layers underneath the roof.  (App. supp. R4, tab 606)  These layers underneath the roof are discussed in more detail below.  B-V did not include details of these hidden, underneath layers of the hammerhead roof within the Design Criteria for prospective bidders (tr. 1/119).

10.  USACE's Project Engineer posted a question to the lead Designer of Record, in the Dr. Checks System on June 26, 2014, if the existing roof will remain in place or whether it needs to be removed to install the new gable roof.  The Designer of Record responded on July 22, 2014, that "It was the intent of the RFP to allow the Design Build Contractor to leave the existing roof in place as possible while providing proper connection[] of the new roof framing to the existing building.  Wording to that end will be added to the RFP in paragraph 5.3.4 c) ii."  (App. supp. R4, tab 742 at 3; tr. 3/107, 109-10)

11.  B-V's estimate noted that the existing roof was to remain, "current roofing is built-up.  New roof will be pitched standing seam metal.  We are not intending that existing roof will be removed" (JSOF ¶ 2; app. supp. R4, tab 352 at 15).

*Relevant Contract Clauses and Design Criteria Specifications*

12.  The contract contained the standard clauses for construction contracts, including Federal Acquisition Regulation (FAR) 52.233-1 DISPUTES (JUL 2002), FAR 52.236-2 DIFFERING SITE CONDITIONS (APR 1984), and FAR 52.236-3 SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR l984) (R4, tab 2 at 41).

3

13.  Section 00100 of the Proposal Submission Requirements states that "The Contractor will provide all design, management, supervision, labor, materials, tools, and equipment necessary for the performance of the work.  Task orders may be either Design-Build or Design-Bid-Build" (R4, tab 2 at 5).

14.  The RFP specified that a new gable roof was to be installed on the existing "hammerhead" roof portion of the building (JSOF ¶ 1; R4, tab 3 at 7).

15.  Consistent with B-V's clarification to USACE on July 22, 2014 (finding 10), the Design Criteria under section 5.3.4(c)(ii), Architecture and Interior Design, Building Exterior, provided that, at the contractor's option, the existing roof could remain, and the contractor could perform selective demolition where the new truss assembly could attach to the new gable roof (JSOF ¶¶ 4, 20):

> Roofing – Gable roof constructed of standing seam metal roof . . . . This gable roof is intended to be constructed so as to create an attic space which must be ventilated.  At the contractor's option the existing roofing may be left in place, with only selective demolition performed to allow for proper connection of the new roof framing to existing structure.

(R4, tab 3 at 41)

16.  Appendix G to the Design Criteria included some drawings of the existing building, but not the roof of the hammerhead portion of the building (JSOF ¶ 11).

17.  Design Criteria, Appendix G drawing AE4, titled "EXISTING 8609 BUILDING SECTION" references the roof (JSOF ¶ 12; R4, tab 3 at 369).  We find that this figure is not of the hammerhead portion of the roof; the roof "crown" is barely visible, not called out, and there are no scales to determine the amount of inflection of the main roof portion.



18. Drawing AE4 depicted a cross-section of the barracks portion (not the hammerhead) of the building in its existing condition, looking west down the longer side of the rectangular portion. The drawing did not depict all features of the existing building, but showed, among other things, concrete slabs (with associated joists) for all three levels (including the "roof deck" or "roof slab"), concrete girders, interior walls, the drop ceiling, the crawl space, and the Ethylene Propylene Diene Monomer (EPDM) roof. (JSOF ¶ 13)

19. In drawing AE-4, the existing EPDM roof is labeled as "NEW EPDM ROOFING OVER 2" RIGID INSULATION OVER LIGHT WT. CONC." This indicated that under the "new" EPDM roofing was a two-inch layer of insulation and a layer of lightweight concrete. (JSOF ¶ 14; R4, tab 3 at 369)

20. The depiction of the existing EPDM roof on Drawing AE4 for the barracks portion of the building showed that it was at a higher elevation at the center than at the edges, but contained no reference measurements of the center elevation versus the edge elevation (JSOF ¶ 15).

21. The depiction of the roof-level concrete slab on Drawing AE4 shows that the slab has a parapet on both long edges of the building, under the existing EPDM roof (JSOF ¶ 16; R4, tab 3 at 369).

22. The RFP contained no similar depiction of the roof for the hammerhead portion of the building (JSOF ¶ 17).

23. The Design Criteria contained Appendix C (Photographs), which did not include any photographs of the existing roof of the hammerhead portion of Building 8609 (JSOF ¶ 21).

24. No as-built drawings of the hammerhead roof were included in the RFP (JSOF ¶ 3).

*Prospective Bidders Were Not Provided Access to the Roof During The Site Visit*

25. By email dated August 12, 2014, a USACE support team member wrote to USACE's Resident Engineer that the site visit should be "organized and focussed [sic]" and "Maybe the ae [Area Engineer] or steve can decide if there's any way of viewing the roof decking" (app. supp. R4, tab 355 at 1).

26. A few days later, USACE provided a guided tour to prospective bidders to walk through Building 8609 that lasted about an hour, but they were not given access to the hammerhead or barracks roofs. (JSOF ¶ 5; tr. 3/115-17; app. supp. R4, tab 355 at 1, 3).

5

27. It was not possible to see the hammerhead roof from the ground or a window in the third-floor barracks (tr. 1/120-23).

*Meltech's Proposal Intended for the Existing Roof to Remain in Place Under the New Gable Roof*

28. On September 4, 2014, B-V provided responses for USACE concerning offerors' questions with respect to the RFP, including B-V's clarification that the existing roof can remain:

> [Question] 122. Is the existing roof to be demoed to provide circulation?
>
> [Response] The existing room [sic, roof] may remain in place as determined by the contractor/designer. Selective demolition may be necessary to provide proper and adequate anchoring of the new roof system.

(App. supp. R4, tab 359 at 16)

29. On September 5, 2014, Meltech submitted its technical and cost proposals for Building 8609's renovation (R4, tab 5).

30. Meltech's proposal, Section 1.3, Assumptions and Techniques, stated that "It is assumed that the existing concrete roof deck will need to be upgraded to meet blast and progressive collapse requirements" (R4, tab 5 at 5). Under Section 1.7.2, Design Criteria, Exterior Design, Meltech stated that the existing roof would be left in place, utilizing selective demolition, with the new roof built on top to allow for connection of the new roof framing to the existing structure. "This gable roof will be constructed so as to create a ventilated attic space and the existing roofing will be left in place, with only selective demolition performed to allow for proper connection of the new roof framing to existing structure." (R4, tab 5 at 7; tr. 1/106-07)

31. Thus, Meltech originally planned to install the new gable roof trusses directly on top of the existing roof system. Meltech wanted to leave the existing roofing in place, as it did not want to incur the cost of removing and disposing of it. Meltech also utilized the existing roof as an air barrier, which would prevent air infiltration and improve the building's energy efficiency. (Tr. 1/107-08) Meltech's price estimate for its proposal assumed that Meltech would "Remove any of the roof top obst[r]uctions for the new truss system" as part of its demolition work (JSOF ¶ 22; R4, tab 287 at 13).

6

*Meltech's Demolition Drawings Intended for the Existing Roof to Remain in Place Under the New Gable Roof*

32. The 95% Exterior Design Submittal, dated August 7, 2015, includes Drawing A-310, which contains several details of roof sections showing the junction between the roof and exterior wall on the barracks portion of Building 8609. Details 1 and 2 of Drawing A-310 contain the note "R-38 BATT INSULATION OVER EXIST. ROOF SYSTEM," indicating Meltech's intent for the existing roof to remain in place over the barracks portion of Building 8609. (R4, tab 31 at 20; tr. 1/111-13)

33. The 95% Exterior Drawing, Sheet S-601, depicts the planned roofs for the barracks (Detail 1) and hammerhead (Detail 2) portions of Building 8609 (JSOF ¶ 27). Detail 1 depicts that the gable roof trusses will rest on a steel I-beam to be placed on the roof as part of the structural reinforcement (JSOF ¶ 28; R4, tab 31 at 13). Thus, the existing roofing system was to remain in place when Meltech installed the new gable roof trusses (tr. 1/113). Detail 2 shows that the gable roof trusses will extend beyond the end of the slab, forming an overhang on both sides of the roof (JSOF ¶ 29; R4, tab 31 at 13).

*The Existing Roof Was Elevated at the Center*

34. During the demolition of the roof in the fall of 2015 to remove mechanical equipment, Meltech discovered that the existing EPDM roof was 4.5 to 5 inches higher at its center. Meltech referred to this elevated center as the "crown" on the hammerhead roof. (JSOF ¶ 8; R4, tab 210) Meltech's Director of Quality Control testified that "[a] crown is a very unusual thing to put on a roof. Normally, you would just pitch a roof by small degree to side or front to back" (tr. 1/155). This elevated crown was unexpected and would have prevented the new trusses from lying flat on the roof (tr. 1/115-17).

*After Identifying the Hammerhead Roof had a Crown, the Designer of Record, URS, Instructed Meltech to Remove the Existing Roof*

35. On October 29, 2015, Meltech submitted RFI 2602-007, stating to its Designer of Record that the hammerhead roof had a crown of 4.5 to 5 inches, which would require supports around the perimeter of the roof. The RFI also stated that the "[c]ontract drawings do not show structural supports for trusses on the existing hammerhead roof (EPDM)." (JSOF ¶ 30) Meltech's Director of Quality Control testified that had the roof been pitched rather than crowned, the trusses could have been "installed as planned" (tr. 1/155).

36. The Designer of Record replied on November 9, 2015, that "the trusses need to be supported from the structural roof slab by an extension of the truss, poured

7

concrete seat, or steel beams" and that "the existing roof will need to be removed for Installment directly to the structural roof slab" (app. supp. R4, tab 612 at 1).

37. On November 10, 2015, Meltech submitted RFI-0075 to USACE, requesting that it concur with the Designer of Record's November 9, 2015, recommendations. USACE never responded to this RFI. (R4, tab 211)

38. The 100% Exterior Drawings, dated February 24, 2016, on Sheet S-601 depict the planned roofs for the barracks (Detail 1) and hammerhead (Detail 2) portions of Building 8609 (JSOF ¶ 31). The hammerhead roof slab is marked as "T/(E)SLAB," which is commonly used in construction that is designed to be lightweight concrete and insulating. The roof construction "consists of a 2 [inch] thick slab with 6 [inch] deep joist ribs (8 [inches] total depth) spanning to concrete beams" (R4, tab 310 at 7, Sheet number S-104 describing the hammerhead roof framing; tab 310 at 13). Immediately above the T/(E)SLAB is an arrow marking the "EXISTING TOPPING" to which the gable trusses are built on or an elevated truss system is built upon (R4, tab 310 at 13).



Detail 1 shows that the gable roof trusses on the barracks portion will rest on a steel I-beam (known as the "steel ring beam") to be placed on the roof as part of the structural reinforcement (JSOF ¶ 32). Detail 2 shows that the gable roof trusses will extend beyond the end of the slab, forming an overhang on both sides of the roof (JSOF ¶ 33; R4, tab 310 at 13).

*The Hammerhead Roof Contained Several Layers that Needed to be Removed*

39. Meltech began demolishing the existing EPDM roof on the hammerhead portion of the building on March 3, 2016, a process that entailed peeling off the EPDM (JSOF ¶ 34; tr. 1/124). In addition to the hammerhead roof having a crown, the roof had several layers that were not identified in the Design Criteria that would need to be removed (1/117-19).

40. The hammerhead portion of Building 8609 utilizes an EPDM membrane that went over the entire roof that also wrapped around the edge of the roofing and extended down the face of the building for approximately 8" (tr. 1/118). Underneath

8

the EPDM was a 2" layer of rigid insulation board. Underneath that layer was a bituminous roof that had been previously applied and roofed over (tr. 1/118). Underneath the bituminous layer was a layer of lightweight concrete. Below the lightweight concrete layer was a concrete slab (tr. 1/118). This was the structural component of the uppermost level of the building. Both the existing EPDM roof and the gable roof that Meltech provided were installed on/above the concrete slab. The concrete slab was referred to at various times as the "roof deck" and "roof slab." (JSOF ¶ 10)

41. None of the Appendix G drawings in the Design Criteria show any of these layers existing on the hammerhead roof (R4, tab 3 at 359-85; tr. 1/119). USACE's Project Engineer testified that several buildings at Ft. Meade had undergone recent renovations, had a similar building structure, included a hammerhead portion, and contained an EPDM upper layer over the top of "built-up" roof layers that required demolition prior to installing a gable roof (tr. 3/102-06).

42. On October 29, 2015, following the identification of the elevated crown portion of the roof, Meltech requested the addition of structural supports around the perimeter edge for the roof trusses using a stack of 2" x 12" blocking. Meltech's designer, URS, replied to Meltech's inquiry on November 9, 2015, denying Meltech's wood block approach, and stated that the existing roof would need to be removed, "the trusses need to be supported from the structural roof slab by an extension of the truss, poured concrete seat, or steel beams. The truss cannot be supported from wood. Also, the existing roof will need to be removed for installment directly to the structural roof slab." (R4, tab 210)

43. The need to remove the EPDM roof system on the hammerhead also eliminated the use of the existing roof as the planned air barrier. As a result, Meltech had to install a new air barrier, which was primarily composed of spray foam. (JSOF ¶ 41, 42)

*During the Roof Demolition, Meltech Discovers a Parapet Along the Perimeter of the Building*

44. Meltech began demolishing the existing EPDM roof on the hammerhead portion of the building on March 3, 2016 (JSOF ¶ 34).

45. During the course of the Project, Meltech discovered that, along the outside edge, the existing EPDM hammerhead roof overlapped a parapet beneath it that was approximately 1 ½ to 2" high. The concrete layer concealed this parapet. (JSOF ¶ 9; tr. 1/118) The presence of the parapet was unexpected, as there were no indications of its existence in the Design Criteria (tr. 1/155).

9

46. On April 12, 2016, Meltech submitted RFI 2602-053 to its Designer, URS. The RFI stated that when Meltech removed the EPDM roof on the hammerhead portion of the building, Meltech discovered that "the perimeter of the hammerhead has a 1-1/2" tall x 5" wide concrete parapet around it, and the deck itself is considerably depressed in areas (1" to 1-1/2")." (JSOF ¶ 35; app. supp. R4, tab 613 at 1) Meltech stated that the presence of the parapet on the hammerhead slab prevented the full length of the trusses of the gable roof from bearing on the concrete slab (JSOF ¶ 36; app. supp. R4, tab 613 at 1). Meltech concluded that if the parapet were partially demolished to receive the gable roof trusses, the trusses would still not bear on the concrete slab for their full length due to the presence of depressed areas in the concrete slab (JSOF ¶ 37; app. supp. R4, tab 613 at 1).

47. URS replied on April 15, 2016, stating, in part, that the "Truss design shown on drawings is intended to illustrate the concept configuration of the cold formed metal truss members only. Per specification section 05 40 00, the truss design and its connections are a delegated design and should be submitted for review as a shop drawing to comply with loading/performance criteria indicated in the specification and drawings" (app. supp. R4, tab 613 at 1). Ultimately, the design decision was deferred to the Designer of Record for Trusses, which was the truss manufacturer, to develop a new truss design for the hammerhead truss system (tr. 1/141-42; tr. 3/90-92). The new hammerhead truss system incorporated cross-bracing to the webbing of the trusses, as well as increased reinforcement to the bottom chord of the trusses, where the bottom chord was strengthened to support the truss without bearing on the roof deck (JSOF ¶ 40; app. supp R4, tab 835; tr. 1/141; tr. 3/91-94).

48. A raised deck at the edge of the hammerhead roof, where it met the barracks portion of Building 8609, was constructed. As some portions of the hammerhead wall lacked a parapet on their edge, a raised deck was necessary to support the truss system. (R4, tab 218 at 8, 16; tr. 3/100-02)

49. On May 16, 2016, Meltech sent Letter S-0028 to USACE concerning "Depressions in Roof of Hammerhead an Unforeseen Condition." The letter stated that the hammerhead roof was identified as not being level after the removal of roofing materials, and it had depressions that prevented the roof trusses from bearing directly on the roof slab. Meltech stated that it was required to strengthen the bottom chord of the trusses and install them to be supported on the exterior roof lines. Meltech alleged that this was an "unforeseen condition." (JSOF ¶ 38; R4, tab 213 at 1) Page 2 of the letter contained a cost breakdown in the amount of $8,276.14 (R4, tab 213 at 2). Meltech's Director of Quality Control and Safety testified that the depressions were unusual "because, normally, concrete is troweled flat and made smooth," which was part of the trade. As a consequence, the untroweled concrete was uneven and "in [a]

very rough condition." (Tr. 1/128-29, 155-56) As a consequence, these "undulations and depressions [in the concrete] would not allow a truss to sit flat on it" (tr. 1/129).

50. On May 23, 2016, Meltech submitted RFI-0090 to the USACE. The RFI stated that the existing concrete roof slab had multiple depressions that prevented Meltech from installing the truss bottom plate to the concrete roof slab. USACE responded to the RFI on June 23, 2016, concluding "this is not a different site condition" (JSOF ¶ 39; R4, tab 214 at 1). USACE stated that the design builder should have "verif[ied] the actual structural condition of the building prior stablish [sic, prior to establishing] the basis for the design" citing to Design Criteria paragraphs 6.6.2, 6.6.3, and 6.6.5.b. In addition, USACE stated that the "Design Builder had plenty of time to field verify the actual condition of the hammer head roof and submit a design considering the actual conditions." (R4, tab 214 at 1-2)

51. Meltech's truss manufacturer developed a new design for the truss system where the roof was not the supporting structure, and the bottom chord was strengthened to support it (JSOF ¶ 40; app. supp. R4, tab 835).

52. On September 15, 2016, Meltech submitted RFI No. 2602-117 to its designer, URS. The RFI stated that Meltech intended to use the existing roof as the air barrier, but it needed to remove it because the crown of the roof was conflicting with the truss installation. As a result, Meltech had to install a new air barrier, which was primarily composed of spray foam. (JSOF ¶ 41; R4, tab 216 at 1; tr. 1/157)

53. By letter dated June 12, 2017, Meltech submitted its PCO #21 for the added demolition work, removal of 5 inches[2] of cementitious material that was under the existing roof and install a new air barrier in the form of 2" of spray polyurethane foam insulation and requested reimbursement in the amount of $66,806 (JSOF ¶ 42; R4, tab 221 at 1).

*Meltech's Claim and Contracting Officer's Final Decision*

54. On August 31, 2017, Meltech submitted a request for a Contracting Officer's Final Decision (COFD) for an "unforeseen condition" since the hammerhead roof had depressions in it that prevented the roof trusses from bearing directly on the roof slab. Meltech requested $8,276 to strengthen the bottom chord of the trusses and $66,806 to remove the existing roof and insulation from the hammerhead, removing the crown and installing a new air barrier. The total amount requested was $75,082. (JSOF ¶ 43; R4, tab 222)

---

[2] Meltech's letter indicates 5' (5 feet), which we understand to be a mistake and should be read as 5" (5 inches).

11

55. The contracting officer did not issue a final decision, and Meltech filed its notice of appeals on August 23, 2018, from the contracting officer's deemed denial (tr. 1/158). The Board docketed Meltech's request for equitable adjustment dated May 16, 2016 (finding 49) in the amount of $8,276, for the costs associated to strengthen the bottom chord of the trusses as ASBCA No. 61762. The Board docketed the request for equitable adjustment dated June 12, 2017 (finding 53) in the amount of $66,806 for the costs associated with removing the existing EPDM roof, demolition, and installation of a new air barrier, as ASBCA No. 61764.

## DECISION

*The Parties' Contentions*

Meltech alleges that the Design Criteria represented that the new truss-supported gable roof could be installed on the existing roof of the hammerhead portion of the building. Upon discovering the crown, Meltech had to remove the EPDM roof system, which exposed depressions in the roof deck and an unknown parapet portion on the roof edge. Appellant argues that these unforeseen conditions constitute a Type I differing site condition. (App. br. at 71-73; app. resp. br. at 18-20) In the alternative, Meltech argues that the unexpected conditions leading to the demolition of the hammerhead roof, the installation of a more robust truss system, and the introduction of a new air barrier constitute a Type II differing site condition (app. br. 75-76; app. resp. br. at 21-26).

USACE argues that the crown, parapets, and depressions do not constitute Type I differing site conditions because it did not make any representations about their presence or absence (gov't br. at 32; gov't resp. br. at 14-15). In addition, Meltech cannot demonstrate that it relied on a representation that the hammerhead roof had no crown, as its proposal provides contradictory approaches to the roof design. One approach states that the existing roofs would be "replaced" with gable roofs, and the other approach states that the existing roofs would remain and be partially demolished to allow connection of the gable roof framing. (Gov't resp. br. at 14-15) There were no Type II differing site conditions because USACE disclosed similar conditions at the dormitory; these conditions were not unusual, and the depressions did not cause an increase in Meltech's cost of performance (gov't br. at 34-37).

*Type 1 Differing Site Condition*

A Type 1 differing site condition exists when a contractor encounters "[s]ubsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract." FAR 52.236-2(a)(1). To establish entitlement to an equitable adjustment due to a Type 1 differing site condition, a contractor must prove by a preponderance of the evidence that (1) the conditions in the contract differed

12

materially from those actually encountered during performance, (2) the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding, (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents, and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions. *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citing *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998)); *NDG Constructors*, ASBCA No. 57328, 12-2 BCA ¶ 35,138 at 172,502. In determining whether these criteria have been met, the Board must place itself "into the shoes of a reasonable and prudent contractor. . . ." *H.B. Mac, Inc.*, 153 F.3d at 1345.

Whether appellant is eligible for an equitable adjustment for a Type I differing site condition depends on the conditions indicated in the contract documents. The conditions identified in the contract "need not be *explicit or specific* so long as they provide sufficient grounds by which the contractor can justify his expectation of latent conditions materially different from those encountered." *Nova Grp./Tutor-Saliba v. United States*, 159 Fed. Cl. 1, 35 (2022), *aff'd*, 87 F.4th 1375 (Fed. Cir. 2023) (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)). "[T]he contractor must prove that a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348 (Fed. Cir. 2008). The Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922 (citations omitted); *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract"); *Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270, 1272 (Ct. Cl. 1972) (rejecting contract interpretation that would render a clause in the contract meaningless).

USACE's Designer, B-V, who prepared the RFP Design-Build package, had determined that the existing roof could remain in place while the new roof trusses could be directly connected to the existing building (findings 10, 11). In fact, USACE's Project Engineer questioned the Designer about whether the existing roof would remain in place or if it needed to be removed to install the new gable roof. B-V's reply stated that "[i]t was the intent of the RFP to allow the Design Build Contractor to leave the existing roof in place as possible while providing proper connection[] of the new roof framing to the existing building. Wording to that end will be added to the RFP in paragraph 5.3.4 c) ii." (Finding 10) "[The] New roof will be pitched standing seam metal. We are not intending that existing roof will be removed" (finding 11). B-V's new roof determinations and recommendations are captured in the Design Criteria that were provided to prospective bidders. The Design

Criteria under section 5.3.4(c)(ii), Architecture and Interior Design, Building Exterior, provided that, at the contractor's option, the existing roof could remain, and the contractor could perform selective demolition where the new truss assembly could attach to the new gable roof (finding 15).

We determine that this statement in the Design Criteria would reasonably lead a prospective bidder to infer that retaining the existing roof would not interfere with the installation of the new roof trusses. The government argues that it was unreasonable for Meltech to infer that that a central roof crown or a hidden parapet would not interfere with the placement of the new roof trusses. The government's argument is inconsistent with a logical and complete reading of the Design Criteria documents and would render section 5.3.4c "useless." Thus, it would not be a reasonable interpretation by a prudent bidder that Design Criteria section 5.3.4c, which states "the existing roofing may be left in place...[and] connection of the new roof framing to existing structure," to mean that modified roof trusses would be required to avoid an elevated 5-inch roof crown. *See P.J. Maffei Bldg. Wrecking Corp.*, 732 F.2d at 916 (contract "indication" need not be explicit or specific, the documents provided sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered.). A proper technique for contract interpretation is for the Board to place itself in the shoes of a reasonable and prudent contractor and decide how such a contractor would act when interpreting the contract documents. *Int'l Tech. Corp.*, 523 F.3d at 1350. In this spirit, it was reasonable for appellant to assume, if the hammerhead portion of the roof had a crown or parapet, that those features would not interfere with "for proper connection of the new roof framing to existing structure" (finding 15). *See Kinetic Builders, Inc.*, ASBCA No. 32627, 88-2 BCA ¶ 20,657 at 104,399-400 (In a contract for the construction of two softball fields, the Board found appellant's inference was reasonable that the specification's requirement to perform "grubbing" work and the removal of "unsuitable" material using "rakes," which is performed by heavy equipment, including bulldozers, that the ground would be suitable to support heavy equipment); *Kromer, Inc.*, ASBCA No. 23820, 80-2 BCA ¶ 14,465 at 71,331-32 (contractor was entitled to an equitable adjustment for the additional costs it incurred in using the relaxed removal requirement on the areas of the roof that were erroneously shown by the drawings as being free of moisture barrier.); *Chance Constr. Co.*, ASBCA No. 26957, 82-2 BCA ¶ 16,084 at 76,786 (The absence of some streets topography to have a 3-inch crown to aid in water drainage was a latent condition that could not be determined without conducting an elevation and grade survey, and a reasonable pre-bid site inspection does not require taking measurements to verify conditions represented in the bidding documents). Here, section 5.3.4c clearly indicated that the contractor could leave the existing roof in place while allowing the new truss assembly to attach to the new gable roof.

14

Further support can be found in the pre-bid questions and answers. Responses to bidders' questions concerning the roof indicate that the government expected the existing roof to remain in place with little to no demolition required (finding 28). Thus, as a consequence, the existing roof could serve as an air barrier, and the government did not foresee that demolition would be required to overcome a 5-inch roof crown.

Similarly, it was reasonable for Meltech to infer from the Design Criteria descriptions that the contractor would not incur costs for removing the existing roof (including the multiple hidden component layers) as the Design Criteria indicated that the new gable roof could be installed on the existing "hammerhead" roof portion of Building 8609 (finding 14). Thus, it was reasonable for Meltech to infer that retaining the existing roof would allow it to act as an air barrier, thereby preventing air infiltration and improving the building's energy efficiency (findings 30-31).

The government's argument that the Design Criteria drawing AE4 shows the roof must have certain features, including a crown or parapet (gov't reply br. at 16), is also without merit. The government's support for this argument relies entirely on Drawing AE4. Drawing AE4 represents the main building section and is not a drawing of the hammerhead portion of the roof, it does not show any features of the hammerhead portion of the building, and, in fact, the "crown" referenced by the government is barely visible, not called out, and contains no scales to determine the amount of inflection of the main roof portion (findings 17-18). Additionally, the crown and parapet that the government states are depicted in the *main building* section of drawing AE4, not the hammerhead, are so small that they are nearly indiscernible, are not labeled, and do not include additional details regarding their sizes/dimensions/features. *See B.R. Servs., Inc.*, ASBCA No. 47673 *et al.*, 99-2 BCA ¶ 30,397 at 150,278 (drawings which were captioned "Roof Elevation Change" that showed two sections of the roof that were slightly higher than the rest of the roof, requiring additional insulation, were found to be a differing site condition.); *Parsons Evergreene, LLC*, ASBCA No. 58634, 18-1 BCA ¶ 37,137 at 180,799 (the contractor was entitled to rely on the government's drawings that did not indicate the presence of asbestos); *Skip Kirchdorfer, Inc.*, ASBCA No. 22722 *et al.*, 79-2 BCA ¶ 14,092 at 69,313 (The Board finding a differing site condition in a contract to remove existing mineral surfaced roll roofing and asphalt shingle down to the roof sheathing and to replace the roof sheathing when the included drawings from the specification did not depict the undersurface of the existing roofs, and a site visit did not visibly alert bidders to the presence of multiple hidden layers of roofing.); *compare Korte Constr. Co.*, ASBCA No. 63148, 23-1 BCA ¶ 38,454 at 186,908-09 (a contractor ignoring contract drawing which called out certain features with "CW," but did not define the term, raised the duty for the contractor to inquire), *with Lebolo-Watts Constructors 01 JV, LLC*, ASBCA No. 59740 *et. al.*, 21-1 BCA ¶ 37,789 at 183,433 (Where there is an obvious or patent ambiguity in the contract, it "imposes upon it *a duty to inquire of the government*," which "tends to deter a bidder, who knows (or should know) of a

serious problem in interpretation, from consciously taking the award with a lower bid (based on the less costly reading) with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials take the other view after the contract is made.") (emphasis added).

Because there was a "flat roof," a bidder would reasonably expect that the main building portion of building 8609 would have some curvature or slope to facilitate water drainage. Flat roof drainage systems are designed to collect and channel water away from the roof's surface, preventing water accumulation, ponding, and potential damage. *See Leonard Blinderman Constr. Co.*, ASBCA No. 18946, 75-1 BCA ¶ 11,018 at 52,441, 52,444, 52,447. Thus, drawing AE4, which depicts some curvature/slope in the main building section of the roof, is not surprising. These minor features described in the main building section of the roof would not put a bidder on notice to inquire whether there would be a 5-inch crown in the hammerhead that would interfere with the new gable roof installation (finding 34). *See White v. Edsall Constr. Co.*, 296 F.3d 1081, 1085 (Fed. Cir. 2002) (the duty to seek clarification of patent ambiguities or defects does not require the contractor to "ferret out hidden or subtle errors in the specifications.").

In addition, the government argues, "if the crown on the hammerhead was in the way of the bottom truss chord, Meltech could have avoided the crown by elevating the chord by the small amount necessary to clear the five-inch crown, and Meltech did not need to remove the existing roof" (gov't reply br. at 13). The government raised this argument for the first time in its reply brief without any citation to the Rule 4 file, an expert report, or witness testimony. Arguments raised for the first time in a reply brief are waived. *Raytheon Co., Space & Airborne Sys.*, ASBCA No. 57801 *et al.*, 15-1 BCA ¶ 36,024 at 175,960 n.3; *see also Sys. Mgmt. & Research Techs. Corp. v. Dept. of Energy*, CBCA No. 4068, 16-1 BCA ¶ 36,333 at 177,138 n.7 (citing *Bannum, Inc. v. United States*, 121 Fed. Cl. 543, 552 n.6 (2015)). Even if we were to consider this argument, we would remain unpersuaded because removing the EPDM roof was not a desired outcome by Meltech. It had intended to use the existing roof as an air barrier and place the trusses directly on top, consistent with the Design Criteria (findings 14-15; 30-31; *see also* findings 10-11). The government now argues that Meltech should have modified the roof trusses *even more* to minimize roof removal. This position is inapposite of the Design Criteria which clearly outlines that prospective bidders could build directly on top of the existing roof, and appears to concede the present issue, entitlement. Furthermore, our caselaw does not permit us to balance the USACE's reasonableness against that of the contractor. The focus of our inquiry must be on the reasonableness of the contractor. This focus serves to incentivize contractors to carefully and reasonably interpret contract documents. *See H.B. Mac, Inc.*, 153 F.3d at 1343; *United States Army Corps of Eng'rs v. John C. Grimberg Co.*, 817 F. App'x 960, 963 (Fed. Cir. 2020). In any event, the government's contention that Meltech unreasonably removed too much of the existing roof is more appropriate for quantum.

Nor did the pre-bid site visit put bidders on notice that the hammerhead roof would have a crown, roof depressions, a parapet, and multiple layers that would interfere with the roof truss installation and its use as an air barrier. It is well-settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed. *See Hardwick Bros. Co., II v. United States*, 36 Fed. Cl. 347, 406 (1996); *H.B. Mac, Inc.*, 153 F.3d at 1346. However, the government bears the burden of proving the knowledge that should be attributed to the contractor. *Skip Kirchdorfer, Inc.*, 79-2 BCA ¶ 14,092 at 69,313 (evidence presented was not persuasive that the contractor could have determined by the site visit that additional roofing was under the visible roofing); *Tech. Servs., GmbH*, ASBCA No. 44457, 96-2 BCA ¶ 28,338 at 141,515 ("there is no basis for charging appellant with knowledge or notice of the actual conditions at the time of bidding."). Ultimately, whether the site investigation was reasonable "is dependent upon the facts and circumstances of the particular case." *S.T.G. Constr. Co. v. United States*, 157 Ct Cl. 409, 415 (1962)

Here, the USACE internally discussed the site visit for prospective bidders and pondered "if there's any way of viewing the roof decking" (finding 25). However, the site visit for Building 8609 did not include access to the roof, nor was the roof visible from the ground or an elevated position (findings 26-27). While contractors should not take lightly the requirements of a pre-site investigation, *see Buckeye Elec. Co.*, ASBCA No. 22408, 80-1 BCA ¶14,336 at 70,683-84, such requirements do not obligate bidders to discover hidden subsurface conditions with a reasonable pre-award inspection. Accordingly, identifying an elevated crown portion, parapet, roof depressions, and multiple roof layers would not have been possible without access to the hammerhead roof, and Meltech reasonably relied on the information provided to it at the time of bidding. *See, e.g.*, *Leonard Blinderman Constr. Co.*, 75-1 BCA ¶ 11,018 at 52,441, 446 (Board finding a reasonable site investigation even though "the roofing business may expect to meet with defects and depressions in old roofs, we do not consider that the hidden condition obtaining in this instance" when roof depressions could not be visually observed or "perceived merely by walking about the roof; it required the use of surveying instruments or a string level operated by two persons to ascertain the existence of this depression."); *Pac. Alaska Contractors, Inc. v. United States*, 436 F.2d 461, 469 (Ct. Cl. 1971) (holding that, to prevail on a Type I claim, contractor must adduce proof of "indications which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered"); *Hanna Contracting Co.*, ASBCA No. 38597, 90-1 BCA ¶ 22,306 at 112,019-22, (The Board denying the contractor's built-up roof and multiple roof layers differing site conditions claim when the specification clearly stated that the contractor was to visit and carefully examine the job site and become thoroughly familiar with all existing conditions, but the contractor failed to attend the site inspection which the government had shown bidders holes in the roof canopies and observed the built-up roofing and the roof thickness). There was simply no indication

17

from the evidence that this site inspection put bidders on notice of the conditions encountered on the roof.

The government has several arguments that need not be discussed here, but have been considered, including the sufficiency of the evidence.[3]

Accordingly, we conclude by a preponderance of the evidence that (1) the hammerhead roof descriptions in the contract differed materially from those actually encountered during performance, (2) the presence of 5-inch crown and roof depressions on the hammerhead roof were unforeseeable and precipitated the need to perform extensive roof demolition and modifying the roof trusses to lay onto the parapet, and (3) Meltech reasonably relied on the Design Criteria descriptions and USACE's guided site visit.

The final element necessary for Meltech to establish entitlement to an equitable adjustment due to a Type 1 differing site condition is whether it was damaged because of the material variation between expected and encountered conditions. Meltech's hammerhead roof claims lay out three sets of damages related to identifying the 5-inch hammerhead roof crown: (i) demolition to remove the existing EPDM and underneath roof layers (finding 53), (ii) installation of a new air barrier (finding 53), and (iii) modifying the roof trusses (finding 49).

---

[3] We find no merit in the government's argument that Meltech's Type I Differing Site Condition claim should fail since none of the appellant's witnesses had first-hand knowledge of what Meltech assumed when it prepared its proposal (gov't br. at 32). *See PBS&J Constructors, Inc.*, ASBCA Nos. 57814, 57964, 14-1 BCA ¶ 35,680 at 174,652-53 (while the lack of first-hand witnesses can be probative, the Board found by the preponderance of the totality of the evidence that appellant failed to meet its burden for a Type I Differing Site Condition). Thus, our Board and sister jurisdictions do not require first-hand witnesses to establish what the appellant assumed at the time of submitting its proposal. While first-hand witness testimony may strengthen the appellant's case, it is not a strict requirement under the legal standards for differing site condition claims. The appellant must demonstrate reasonable reliance on the contract documents and the un-foreseeability of the actual site conditions based on the information available at the time of bidding. In these appeals, there is no need for first-hand witnesses to testify, as Meltech's proposal clearly outlines its understanding of the requirements and how it intends to install the new gable roof directly onto the existing structure. *See* (findings 31-32; *see also* finding 34). In addition, consistent with the hearing testimony, Meltech's 100% drawing is consistent with what it understood pre-bid concerning the ability to place the new gable roof on top of the existing roof (finding 38).

The following describes Meltech's damages as a result of the material variations between Meltech's expected and encountered hammerhead roof conditions. The RFP Design Criteria contemplated that the existing roof could be left in place and the trusses could be installed directly onto the roof with only minimal or selective demolition (findings 10-11, 14-15). However, the presence of the 5-inch hammerhead roof crown would not allow the trusses to lay flat onto the existing roof, which required extensive demolition (findings 34-42, 44). This demolition meant that the existing roof could no longer serve as an air barrier, and Meltech would need to install a new one (findings 43, 52-53). Only after demolition was the hidden parapet portion identified under the multiple roof layers (finding 45). The presence of the parapet complicated the installation of the roof trusses (finding 46). The narrow parapet was insufficient to support the weight of the roof trusses, necessitating the modification of the bottom chords of the trusses to adequately support their weight, which was suspended a few inches above the roof decking (findings 47-49).

Meltech experienced a Type I differing site condition, characterized by 5-inch crown and roof depressions on the hammerhead portion of the roof. The purpose of the Differing Site Conditions clause is to enable contractors to submit more accurate bids by eliminating the need for them to inflate their bids to account for contingencies that may not materialize. *See Foster Constr. C.A. & Williams Bros. Co. v. United States,* 435 F.2d 873, 887 (Ct. Cl. 1970); *H.B. Mac, Inc.,* 153 F.3d at 1343. The presence of the 5-inch roof crown on the hammerhead roof directly led to Meltech's damages. Meltech is entitled to an equitable adjustment for increased costs resulting from the differing site conditions.

*Type II Differing Site Condition*

In the alternative, Meltech argues that the unexpected conditions leading to the demolition of the hammerhead roof, the installation of a more robust truss system, and the introduction of a new air barrier constitute a Type II differing site condition (app. br. 75-76; app. resp. br. at 21-26). In light of our finding a Type I Differing Site Condition, there is no need to resolve its alternative theory

<u>CONCLUSION IN APPEAL Nos. 61762, 61764</u>

For the foregoing reasons, a Type I Differing Site Condition is found, and the appeals are sustained. We return this matter to the parties for resolution of quantum.

Dated: January 16, 2026

STEPHANIE CATES-HARMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61762, 61764, Appeals of Meltech Corporation, Inc., rendered in conformance with the Board's Charter.

Dated: January 16, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals